**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| BANK OF AMERICA, N.A., | ) | |
| Plaintinff, | ) | |
| | ) | |
| v. | ) | No. 10 CV 1608 |
| | ) | Judge Blanche M. Manning |
| R. B. GUSTAFSON COMPANY d/b/a | ) | |
| GUSTAFSON LIGHTING, | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

Defendant R. B. Gustafson Company, better known as Gustafson Lighting, sells low-voltage lighting fixtures for use in recreational vehicles. For nearly a quarter century, it obtained parts it needed to assemble those lighting fixtures from Berman Industries, Inc. and related companies.

The relationship was uneventful until 2007, when Berman allegedly began to deliver thousands of parts Gustafson contends it did not want and for which it has not paid. Bank of America subsequently purchased Berman's accounts receivable and now seeks payment of more than $362,784.58 for the unwanted parts.

Before the court is Bank of America's motion for summary judgment, in which it argues Gustafson must pay for the delivered parts. Gustafson responds that disputed questions of fact about the terms of the parties' agreements preclude the entry of summary judgment. For the reasons that follow, the motion for summary judgment is denied.

**BACKGROUND**

The following facts are agreed except where noted. Gustafson began ordering lighting parts from Berman in 1985. The parties did not have a written agreement that governed their relationship. Instead, Gustafson submitted what were entitled "Purchase Order Request Forms"

to Berman identifying the quantity of parts it wanted Berman to manufacture at its factories in China and have shipped to Berman's warehouse in Olive Branch, Mississippi. The Purchase Order Request Forms contained no terms and conditions—they contained only a description of the product, the quantity requested, and the price per item.

After the product was received at the Olive Branch warehouse, Gustafson would either "release" the goods, meaning it asked that the goods be shipped from the Berman warehouse in Olive Branch to Gustafson's facility in Elkhart, Indiana, or on one occasion Gustafson directed Berman to destroy products that Gustafson could not use. According to Gustafson, it was obligated to purchase only the product it "released" from Olive Branch, though it admits it paid for the products it directed Berman to destroy rather than "release."

In April 2008, Berman complained to Gustafson about the amount of products that Gustafson had requested on Purchase Order Request Forms dating back to 2007, but had not "released" and so were accumulating at the Olive Branch warehouse. In response, Gustafson "released" all of the products that had been sitting at Olive Branch for more than 150 days. The parties began discussing ways to further reduce the amount of product left sitting at the Olive Branch warehouse, but the discussions were unfruitful.

In November 2008, a Gustafson employee forwarded to Berman an internal e-mail in which Gustafson sent a warning to its suppliers like Berman to stop over shipping products:

> We will not accept any over shipments of products. Please email our suppliers and advise them that overshipments will be sent back to them at their expense unless they call and we change our PO.

November 5, 2008 e-mail (attached as Exhibit 4 to Gustafson's Response [68-1]).

The following month, Berman delivered to Gustafson a large number of products that Gustafson had not "released." Gustafson did not immediately discuss the shipment with Berman. The first discussion about the December 2008 delivery occurred about four months later sometime after April 2009. By then, Berman had defaulted on a loan from Bank of America, and had assigned its assets, including the accounts receivable it had put up as collateral for the loan, to a trust for the benefit of Berman's creditors.

The April 2009 discussion occurred between Kirk Sobecki, the chief executive officer of Gustafson, and Ronald Benishy, a representative of the assignee. Sobecki told Benishy that Gustafson had not "released" the products that had been delivered in December 2008, and offered to return the products. The assignee never accepted the offer, and Gustafson never returned the product and never paid for it. However, it did sell or use some of the delivered product, though it does not know how much.

In addition to the December 2008 shipment of products, Bank of America contends that Gustafson also failed to pay for products delivered on a number of other occasions between 2007-09. In total, Bank of America contends that Gustafson has failed to pay for $362,784.58 worth of products. On June 26, 2009, the assignee wrote to Gustafson demanding payment of $362,784.58. After Gustafson failed to comply, Bank of America (which by then had purchased the accounts receivable at auction) filed the instant suit.

Bank of America alleges four claims against Gustafson under the court's diversity jurisdiction. In Count I, it alleges that Gustafson breached its contract with Berman by failing to pay for all of the products for which it had submitted a Purchase Order Request Form. In Count II, it alleges a claim of unjust enrichment based upon Gustafson's acceptance of product for

which it never paid.  In Count III, it alleges a claim of conversion based upon Gustafson's failure

to pay for the delivered products.  And finally in Count IV, Bank of America alleges a claim of

account stated based on Gustafson's failure to comply with the demand for payment.

Before the court is Bank of America's motion for partial summary judgment.  In it, Bank

of America seeks judgment on its claims for breach of contract (Count I) and unjust enrichment

(Count II).  For the reasons that follow, the motion is denied.

## ANALYSIS

### I.      Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law."  Fed R. Civ. P.

56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "The evidence of the

non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Valenti*

*v. Qualex, Inc.*, 970 F.2d 363, 365 (7th Cir. 1992), citing *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 255 (1986).  Moreover, a court should grant a motion for summary judgment only

when the record shows that a reasonable jury could not find for the nonmoving party.  *See*

*Valenti*, 970 F.2d at 365; *see also Anderson*, 477 U.S. at 248.

Thus, in order to withstand a motion for summary judgment, the nonmoving party must

show that a dispute about a genuine issue of material fact exists.  *See Anderson*, 477 U.S. at 248.

The nonmoving party may not merely rest upon the allegations or details in his pleading, but

instead, must set forth specific facts showing there is a genuine issue for trial.  *See Celotex*, 477

U.S. at 322; *Anderson*, 477 U.S. at 248.

Although neither party has expressly discussed what state's law applies, they have both relied on Illinois law in their briefs, including Illinois' enactment of the Uniform Commercial Code. The court will therefore also look to Illinois law.

## II.     Breach of Contract (Count I)

### A.     Gustafson's Obligations Under the Contract

Bank of America contends that it is entitled to summary judgment on its breach of contract claim because Gustafson's obligation to pay for the products Berman delivered is undisputed. In support, Bank of America argues that even though the Purchase Order Request Forms that Gustafson submitted contained no terms or conditions, under the UCC they are deemed to be offers to purchase that Berman accepted, and therefore Gustafson was obligated to pay for the ordered products upon delivery.

Under Illinois law, the Uniform Commercial Code applies to transactions involving the sale of goods. *See* 810 Ill. Comp. Stat. 5/2-102. When an agreement for the sale of goods is silent on an issue, courts imply reasonable contract terms as set forth in the UCC. *See Ryan v. Wersi Electronics GmbH & Co.*, 3 F.3d 174, 180 (7th Cir. 1993). However, the gap-filling provisions of the UCC operate only to the extent the parties' agreement is silent on an issue. *See Frank Novak & Sons, Inc. v. Sommer & Maca Industries, Inc.,* 538 N.E.2d 700, 703 (Ill. App. Ct. 1989) (parties are free to agree that payment is due at a time other than provided for in the UCC). When determining whether the parties' agreement contains a particular term, in addition to whatever written agreement exists the court may also look to the parties' course of performance

and course of dealing, except that evidence of course of performance and course of dealing may not be used to contradict any written terms of the agreement.[1]  *See* 810 Ill. Comp. Stat. 5/2-202.

Bank of America argues that it is entitled to summary judgment because it is undisputed the Purchase Order Request Forms that Gustafson submitted constituted offers to purchase, and that Berman's acceptance of those offers obligated Gustafson to pay for the product ordered.  In support, Bank of America relies on the gap-filling provisions of the UCC.  Specifically, Bank of America contends that under § 206(1)(b) of the UCC, "an order or other offer to buy goods for prompt or current shipment shall be construed as inviting acceptance either by a prompt promise to ship or by the prompt or current shipment of conforming or non-conforming goods."  810 Ill. Comp. Stat. 5/2-206(1)(b).  Bank of America contends that once Berman shipped the products for which Gustafson had submitted a Purchase Order Request form, Gustafson was required to pay for them.  *See* 810 Ill. Comp. Stat. § 5/2-310 ("Unless otherwise agreed (a) payment is due at the time and place at which the buyer is to receive the goods . . .").

In response, Gustafson argues that there is no need to resort to the gap-filling provisions of the UCC because the parties had established a course of performance or dealing under which Gustafson was required to pay only for those products it had "released" from the Olive Branch warehouse.  In support, it has identified the following testimony from Gustafson CEO Kirk Sobecki regarding its agreement with Berman:

---

[1]The UCC requires that any contract for the sale of goods of $500 or more be in writing. *See* 710 Ill. Comp. Stat. 5/2-201(a).  It is undisputed that the Purchase Order Request Forms were in writing, as well as the "releases" that Gustafson sent to Berman.  Neither party has raised an issue about whether the UCC's requirement of a writing has been satisfied and, therefore, the court shall not address the issue further.

> A:    We would order products from Berman.  They
>       would bring it in to Olive Branch, Mississippi, and
>       store it in the warehouse.  Then we would tell them
>       what we wanted to release from the warehouse.
>
>       Once they released it to us and sent it up to us, then
>       they would invoice us and we would pay the
>       invoice.
>
>       . . .
>
> Q:    Was there something that constituted the agreement
>       between Gustafson and Berman with regard to the
>       order of particular products?  Would that be the
>       purchase order?
>
> A:    We didn't send a purchase order.  We sent a request
>       for product form.  . . . So we would request them to
>       bring product into Mississippi and store it unless we
>       released it from Mississippi.

Transcript of Kirk Sobecki Deposition (attached as Exhibit 2 to Response [63-1]) at 16-18.  It

has also identified deposition testimony from Gustafson's production manager Brian Gamble,

who agreed that Gustafson was obligated to purchase only the product that it had "released:"

> A:    From the time I took over purchasing in 2001 until
>       the time I left, I wasn't aware of any agreement that
>       if we purchase something, that we had to pay for
>       that with Berman.  I was always under the
>       agreement we purchase something and it was put in
>       the warehouse.  We would not be obligated to have
>       to pay for it unless we released it and shipped it to
>       another place.

Transcript of Brian Gamble Deposition (attached as Exhibit 3 to Response [63-1]) at 40.

As discussed above, parties can agree to terms that vary from the gap-filling terms set out

in the UCC.  *See Frank Novak & Sons,* 538 N.E.2d at 703.  Gustafson has presented evidence

that the terms of its agreement with Berman varied from the gap-filling terms of the UCC in that

Gustafson was required to pay for only the products that it "released" from the warehouse, as opposed to every item requested on the Purchase Order Request Forms.

Bank of America nevertheless argues that Gustafson's evidence that it was required to pay only for products that it had "released" is insufficient to create a disputed question of fact because it is contradicted by other evidence. For instance, Bank of America points to a chain of e-mails from April 2008 in which representatives from Gustafson and Berman purportedly attempted to arrange for the automatic release of products that had sat at the Olive Branch warehouse a certain number of days. Bank of America argues that the automatic release of product contradicts Gustafson's contention that product left the warehouse only if after being "released." Bank of America also points to testimony from Berman's former president, Ron Armstrong, who testified at his deposition that "[y]ou are making a statement 'release' as if it meant that they [Gustafson] didn't order the merchandise until they actually told us that they wanted it to come from the inventory, and that's not correct." Transcript of Ron Armstrong Deposition (attached as Exhibit C to Bank of America's Responses to Gustafson's Rule 56(b)(3) Statements [70-1]) at 91.

In addition, Bank of America points to evidence that on one occasion, Gustafson offered to pay for products held at the Olive Branch warehouse that it did not need and ordered destroyed. Bank of America argues that if Gustafson was under no obligation to purchase products at the warehouse, there would have been no need for it to offer to pay for the product it ordered destroyed.

These contradictions only highlight the fact that the terms of the agreement between Gustafson and Berman are disputed. Bank of America admits as much in its responses to

Gustafson's statements of undisputed facts. Specifically, in response to Gustafson's contention that it "was only obligated to pay for goods and inventory if Gustafson "released" the goods/inventory, Bank of America responded "disputed," citing in support Armstrong's testimony that Gustafson was required to take all of the product they had ordered. *See* Bank of America's Responses to Gustafson's Rule 56(b)(3) Statements [70-1] ¶ 51.

Disputed questions of material fact defeat, not support, the entry of summary judgment. *See* Fed R. Civ. P. 56(a); *see also Celotex Corp*, 477 U.S. at 322. Because of the disputed questions of fact over the terms of the Gustafson/Berman agreement, Bank of America's motion for summary judgment on the basis that the relevant facts are undisputed is denied.

### B.     Acceptance of Nonconforming Goods

Alternatively, Bank of America argues that even if the terms of the Gustafson/Berman agreement are disputed, it is nevertheless entitled to summary judgment because under the UCC Gustafson is deemed to have accepted the "unreleased" product. Under § 2-601 of the UCC, a buyer must either accept or reject nonconforming goods. *See* 810 Ill. Comp. Stat. § 5/2-601. Delivery of goods not ordered is considered a nonconformity, and the excess goods must either be accepted or rejected. *See Van Dorn Co. v. Future Chemical & Oil Corp.*, 753 F.2d 565, 574 (7th Cir. 1985) (applying 810 Ill. Comp. Stat. § 5/2-601). A buyer is deemed to have accepted goods if he has failed to effectively reject goods, or does any act inconsistent with the seller's ownership. *See* 810 Ill. Comp. Stat. § 5/2-606(b), (c). Whether an acceptance or rejection has occurred, and the reasonableness of a buyer's rejection, are all questions for the fact-finder. *See Alden Press, Inc. v. Block & Co., Inc.*, 527 N.E.2d 489, 495 (Ill. App. Ct. 1988).

1.       **Evidence of Gustafson's Rejection**

Bank of America contends that under UCC § 2-606(b), Gustafson is deemed to have accepted the "unreleased" products because it failed to effectively reject them within a reasonable time after delivery. According to Bank of America, the record contains no evidence that Gustafson rejected the products and, in fact, the evidence shows that Gustafson accepted the products by engaging in acts that are inconsistent with Berman's ownership of them.

Gustafson responds by identifying evidence that it contends shows it rejected the products that were delivered but never "released." Specifically, Gustafson points to the November 2008 e-mail that Gustafson CEO Kirk Sobecki sent to Berman in which Sobecki stated that Gustafson would no longer accept overshipments. It also points to a conversation in April 2009 during which Sobecki told Ronald Benishy, a representative of the assignee of Berman's accounts receivable, that Gustafson had received a delivery of products in December 2008 that it had not "released" and offered to return the products.

Bank of America argues that this evidence is insufficient to defeat the motion for summary judgment because it does not establish that Gustafson's rejection was reasonable. Specifically, it contends that Gustafson's rejection was unreasonable as a matter of law because (1) it came 4 months after the December 2008 delivery of the bulk of the unreleased products, and (2) the November 2008 e-mail warning that future overshipments would be rejected predated the December 2008 delivery.

"[T]he reasonableness of a rejection of goods is ordinarily a question for the trier of fact." *Alden Press, Inc. v. Block & Co., Inc.*, 527 N.E.2d 489, 495 (Ill. App. Ct. 1988). "Moreover, not only is the reasonableness of a rejection a question of fact but, indeed, whether conduct has

amounted to an acceptance or a rejection of goods is a question of fact to be determined within the framework of the facts of each particular case." *Id.* (internal citation, quotation marks, and brackets omitted). Bank of America argues that under *Alden*, the reasonableness of a buyer's rejection of goods is a question for jurors only where material facts surrounding the rejection are in dispute, which Bank of America contends is not the case here.

Bank of America's premise that no material facts are in dispute is unfounded. For example, Bank of America itself has identified a disputed question of fact regarding the reasonableness of Gustafson's rejection. It contends that the meaning of the phrase "over shipments" used in Sobecki's November 2008 e-mail is disputed: the "point in dispute is not whether the e-mail was sent—but its meaning. . . . Gustafson wishes the Court to assume the term 'overshipments' means shipments in excess of what Gustafson 'released' from the warehouse. Gustafson's proposed reading, however, is unsupportable . . ." Reply [69-1] at 12. Moreover, nothing in *Alden* limits the role of jurors to resolving factual disputes as opposed to determining reasonableness. Therefore, the factfinder must evaluate Gustafson's actions to determine if the rejection was reasonable.

Bank of America also argues that the November 2008 e-mail is irrelevant because it predated the delivery of the bulk of the "unreleased" product. However, the reasonableness of a buyer's rejection depends upon the "facts and circumstances of each case," and allows jurors to examine a variety of factors including "whether the seller acted in bad faith." *Alden*, 527 N.E.2d at 496 (internal quotation marks and citation omitted). Jurors are thus entitled to examine the circumstances surrounding Gustafson's rejection, including whether Berman acted in bad faith

by delivering "unreleased" product after Gustafson warned that it would no longer accept "over shipments."

Because the determination of whether a reasonable rejection occurred is for jurors to make after considering the surrounding facts and circumstances, Bank of America's request for summary judgment on the basis that Gustafson failed to reasonably reject Berman's shipments is denied.

### 2.      Evidence of Acts Inconsistent with Berman's Ownership

Alternatively, Bank of America argues that under UCC § 2-606(c), Gustafson is deemed to have accepted the delivered products by engaging in acts inconsistent with Berman's ownership of them.  In support, Bank of America notes that Gustafson has admitted that it used or sold some of the products that were delivered but not released.  *See* Responses to Bank of America's Statement of Facts [67-1] ¶ 23 ("Gustafson is unable to identify which Products it has used or sold, but admits that at least some have been used and sold.  RESPONSE:  Not Disputed.").  According to Bank of America, by admitting that it used and sold some of the delivered products, it is undisputed that Gustafson engaged in acts inconsistent with Berman's ownership of the products, and thereby accepted the products.

Bank of America's argument fails to take into account UCC § 2-604, under which a buyer who has rightfully rejected goods, but to whom the seller has not responded with instructions on what to do with the goods, may "store the rejected goods for the seller's account or reship them to him or resell them for the seller's account with reimbursement . . .  Such action is not acceptance or conversion."  810 Ill. Comp. Stat. 5/2-604.  The buyer's options listed in § 2-604 are not exhaustive and, thus, even use of the goods by the buyer can also be an act that

does not constitute acceptance. *See Alden*, 527 N.E.2d at 496. Whether the buyer's conduct was permitted under § 2-604, or amounts to acceptance through the wrongful exercise of ownership of the goods, turns on whether the buyer acted reasonably under the circumstances. *Id.* ("The overriding rule is that, in determining whether a buyer has so wrongfully exercised ownership over the goods as to be barred from rejecting them, the trier of fact must apply a rule of reasonableness.").

The present record is not sufficiently developed on the issue of the reasonableness of Gustafson's conduct. Although the parties agree that Gustafson cannot identify which products it used or sold, they have not addressed the existence of other evidence of the circumstances under which Gustafson used or sold the product, when the use or sale occurred, what proceeds were generated by the sale, and whether those proceeds are being held for Berman's account.[2] Furthermore, it is not for the court to assess whether Gustafson's conduct was reasonable under the circumstances because the question of reasonableness is for the fact-finder. *Id.* ("whether conduct has amounted to an acceptance or a rejection of goods is a question of fact to be determined within the framework of the facts of each particular case.") (internal quotation marks, brackets, and citation omitted).

Given that the material facts are not undisputed, and given that the assessment of reasonableness is for the jury, not the court, Bank of America has not established that it is

---

[2]Gustafson has admitted that of the $362,784.58 Bank of America seeks, it owes around $50,000. However, it does not identify for which products it owes the money. Therefore, it is not clear from the record whether the $50,000 is money held by Gustafson for the account of Berman based on its use or sale of delivered but "unreleased" product, or whether it is owed for some other reason.

entitled to summary judgment on the basis that Gustafson accepted the delivery of "unreleased" product.

### III.     Unjust Enrichment (Count II)

Bank of America also seeks summary judgment on its claim that Gustafson has been unjustly enriched by retaining, using, or selling the products that Berman delivered for which it has not paid.  Gustafson contends that Berman (through the assignee of its accounts receivable) abandoned the products by failing to repossess them after Gustafson's rejection.  Bank of America responds that Gustafson did not properly reject the goods, leaving no basis for concluding that the goods were abandoned.

To prevail on its claim of unjust enrichment, Bank of America must show "that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience."  *HPI Health Care Services, Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (Ill. 1989).  Bank of America argues that Gustafson's retention of the delivered products caused a detriment that violated the principles of justice and equity.  However, as discussed above, Gustafson has presented evidence that it warned Berman in advance not to deliver any more unreleased products, and that after Berman did so Gustafson communicated its rejection of the products and directed Berman to repossess the product, which Berman never did.

Given the disputed questions of fact regarding the facts and circumstances surrounding Gustafson's purported rejection, both before and after the delivery of the "unreleased" product, the court cannot at this time determine whether Gustafson's retention of the products was unjust or whether it violated the principles of justice, equity, and good conscience.  These disputed

questions require that the motion for summary judgment on Bank of America's unjust enrichment claim (Count II) also be denied.

## CONCLUSION

For the reasons stated, Bank of America's motion for summary judgment [62-1] is denied.


ENTER:

DATE:  July 31, 2012

*Blanche M. Manning*
Blanche M. Manning
United States District Judge